BRIDGES *v.* TEXACO, INC.

No. 42113 January 22, 1962 136 So. 2d 595

*Barnett, Montgomery, McClintock & Cunningham,* Jackson, for appellant.

*Watkins & Eager,* Jackson; *John W. Kelly, Jr.,* New Orleans, La., for appellee.

LEE, P. J.

W. E. Bridges sued Texaco, Inc., a corporation, in the Circuit Court of the First Judicial District of Hinds County, for damages to his poultry and a decrease in egg production allegedly caused by the agents and employees of the defendant in setting off explosive charges of dynamite too near his chicken houses, without warning, when the defendant knew, or ought to have known, that the chickens would be upset and damaged thereby.

The defendant, in its answer, admitted that, on November 26, 1958, it shot a ten pound load of dynamite at a depth of eighty feet approximately 239 feet from the southernmost chicken house of the plaintiff, and a like charge at the same depth about 900 feet in the same direction from that chicken house, with an interval of about one hour between them. They further alleged that these shots were made in the usual, customary, proper and prudent manner. They denied all of the other material allegations of the declaration.

The parties, through their attorneys, agreed to try the cause before the circuit judge without a jury. At the conclusion of the evidence for the plaintiff, the judge, on motion of the defendant, granted a directed verdict for it. From the judgment, in conformity with that holding, the plaintiff appealed.

The appellant has assigned and argues that the court erroneously construed the testimony of the chicken experts, Dr. J. W. Brannon and Van Stephens; that the court arbitrarily and capriciously disregarded the evidence of the plaintiff concerning his record of eggs gatheed from November 26, 1958 and thereafter; and that the court erred in sustaining the motion to exclude and in granting the judgment for the defendant.

The facts, necessary to a determination of the issue in this cause, are as follows: W. E. Bridges, with his wife and three children, lived on Highway 469 about a

mile north of Harrisville. In the early part of 1958, Bridges went into the egg business. He had two houses, each being 26 feet wide and 200 feet long. In two different purchases, he had acquired 3,200 pullets for layers, with one rooster for about 10 hens. Some of these were culled on account of the usual poultry diseases. The hens were kept in the houses.

About noon on Saturday November 26, 1958, at a time when Mrs. Bridges was about her household duties and her husband was away, she heard "a big explosion", and the chickens "started to flying up, and squalling and cutting up." She saw the defendant's equipment in the road near her house, and knew what had happened. Mrs. Bridges said that no one from the company had told her that they expected to set off a seismographic explosion anywhere nearby. The hens had not settled down when her husband came home about 3:30 or 4 o'clock that afternoon.

Mrs. Romie Jennings, who lived just across the road from the Bridges' place, heard "a big explosion, large, and I had a chair on the front porch and it turned over." The explosion jarred her house "real bad". She went over to the home of the Bridges, saw the explosives truck, and figured what had happened. The chickens were making "an awful noise, hollering and flapping their wings * * * a loud crying, squealing noise * * * a continuous noise or squealing." Her house was about the same distance from the explosion as the chicken houses.

Jack Watson, who lived about a quarter of a mile from the Bridges' home, heard "a pretty big explosion" but did not pay so much attention until he heard the chickens. He "never heard a racket like that before * * * they were squalling and hollering like the chickens were scared * * * they cut up there a long time."

Ted Berry, a member of the defendant's crew, was present when the seismographic shot was made. He

said, "It was rather loud * * * maybe a hard jar." The chickens made "a squalling racket after the shot, as chickens do when they are scared." He said they were "squalling" when he left around 2:30 that afternoon. He said that "Usually we didn't shoot a shot that close to a chicken house * * * not quite standard in this case, because it was a little close to the chicken houses." They were in a hurry to get through and get away on a holiday.

When W. E. Bridges got home, the chickens were "flying all over the houses, cackling, carrying on more than usual; terribly disturbed, apparently." Usually when he walked through the houses, they would not pay much attention to him, but that afternoon they got out of his way like they were frightened.

Bridges said that his egg production dropped after November 26. He said that, before the explosion, he had a pad on which he set down the eggs he gathered every day, but that those records were not complete. However, after the shot, he kept daily records which showed that the hens dropped off in egg production. This daily record of eggs, extending from 11/26/58 to 2/17/59, showed 1,514 eggs gathered 11/26/58. The next day there were 1,213, the next day 1,018, with slighter decreases thereafter for a time. He also testified from some notes, showing the number of eggs collected for August, September, October, November and December 1958, and January and February 1959. In March 1959, he sold the birds for meat. Nobody gave him any notice that an explosion would be set off.

There was an agreed stipulation that Bridges, after the explosion, spent about $900 for medication in an effort to treat and cure the chickens.

Van Stephens, General Manager of Flowood Hatcheries, at the time of testifying, with eight years experience in the production of eggs, but who was in the employ of another in 1958-59, handled 360,000 eggs per

week. He had attended short courses in the management of poultry, learned control of diseases, had "posted", that is, cut open and examined, thousands of chickens and knew the propensities and traits of the fowls and the effect of disease, feed, water, light, weather, fright, etc. After lengthy questioning, the court held that he was qualified to testify as an expert. The witness said that Bridges was one of his company's patrons, and that he inspected the egg farm once a week. He was informed of what had occurred on November 26. He went to the farm on Saturday after Thanksgiving, the 29th. The production of eggs had dropped, but the birds were not sick. So he set about to ascertain the cause. He "posted" chickens and found broken eggs. He had good reason to believe those birds were scared and hit something. The first of the next week there were more white feathers, and that was conclusive that they had been scared enough to throw them into a partial moult. By that time production had already gone down. He put them on medicated feed to get them up and prevent their going into a one hundred per cent moult. But the production was then low, and they did not get back to full production. The scare that the chickens got from the explosion is what caused them to go into the moult and reduce production. As loud as the explosion was and the nearness to them was sure to scare them. To his knowledge, the birds were in normal production until the day before Thanksgiving. If they had continued through the last days of November, as they had started out and continued until Thanksgiving, the production would have been higher than the previous month. The birds did not have any disease at the time. The loss in December over November was very important. Production went down November 27, 28 and 29.

After Stephens had been questioned by attorneys on both sides, the judge asked the following question:

"Q. After a fright or an explosion which you believe could cause chickens to go into a moult or quit laying, how — what period of time would it take, ten hours, twelve hours, twenty-four hours, forty-eight hours for it to affect them?

" * * * *

"A. * * * well, it will affect them immediately, but usually it will show up the following day in egg production. You'll have a slight drop the following day and then the second day, it's worse the next day."

Dr. J. W. Brannon was a graduate in veterinary medicine from Auburn University. He had been with the Mississippi Livestock Sanitary Board for over seven years, and fifty per cent of his work is with poultry. He explained that there is a difference between chickens, raised in houses, and those raised on the range. Those in houses, on account of their nervous makeup, will fly up and panic when someone walks in the house. Poultrymen try to make no noise, they avoid strange objects, and use subdued light. He has examined every part of the chicken. He got specimens of these birds and they were normal. He was asked a hypothetical question which embraced all of the facts and circumstances which had been testified about. He said that Bridges and Stephens had conferred with him and related circumstances similar to those stated in the question. He told them at the time that he thought the explosion had some detrimental effect on the flock. His opinion was based on the facts and his experience with other flocks in similar situations. Although he had no experience with dynamite, he had with unusual noises. He explained that sudden changes in a chicken's normal routine will greatly affect them; and that moulting results from some external force exerted on the chicken. After he was informed about the noise, he advised Bridges and Stephens to follow his recommendation, and if the explosion had not affected the chickens, they

would come back to production. They did follow his routine, but without success. Upon questioning by the judge, the witness explained several instances when the flock had failed to return to production on account of noise, and when it was necessary to sell the birds for meat.

After both sides had questioned the witness, the judge asked the following:

"Q. But I'm talking about the effect on production, was it the next day that they were down, or the next day, or the next week, or the next month?

A. I wouldn't want to make a positive statement. I'd say it was within 36 to 48 hours, though.

Q. Can you give me your opinion, then, is the noise, the traumatic effect of the noise, effective immediately or does it take weeks, months, for that to be effective?

A. Well, I would say it would probably start its initial affect within 24 hours, because it takes 24 to 26 hours for an egg to develop, and they would go ahead and lay the eggs that were already formed in the body that day.

Q. In other words, you would expect to see, if noise had a traumatic effect upon the chickens' production, you would expect to see the effect of that noise within 24 to 36 hours?

A. Yes, sir."

When the plaintiff rested, and the defendant made its motion for a directed verdict, the court said:

"Frankly, I am going to sustain the motion because of the fact that both of these alleged experts testified that they would expect the chickens to quit laying within 24 to 36 hours, or to have a drastic reduction. Now, you put into evidence the daily slips of Mr. and Mrs. Bridges and also the records of the company. The company records go all the way back, and they show that on November the 26th, the day of this alleged explosion, which was established, that there were 450 dozen de-

livered, and three or four days later 450 again. I find that the chickens' laying habit did not change, as the experts said that it should, immediately. Neither of them expressed an opinion that it would occur at a later date, so therefore I sustain the motion on the basis that there is no causal relation.''

Thus the factual situation showed that the explosion of dynamite was set off closer than usual to chicken houses; that one shot was not more than 239 feet away; that the shots were very loud; that there was such a jar to the home of Mrs. Romie Jennings that it turned over a chair on the front porch; that the chickens panicked and kept up a continuous loud squalling and flapping of the wings for several hours, and were not calm until the next morning; that egg production began to drop the next day; that when the chickens were seen by an expert on Saturday thereafter, he observed no apparent sickness; that said expert ''posted'' several of the hens and found broken eggs in them and observed the dropping of feathers the first part of the next week; that the advice of a veterinarian, an expert in poultry, was sought and that he suspected fright as the cause of the drop in egg production; that, in accordance with his instructions, the birds were treated to overcome that condition if it had not been produced because of fright; that the treatment was unsuccessful; that both experts were of the opinion that the decrease in egg production was caused by the fright of the chickens due to the dynamite explosions; and that, after the egg production could not be brought back to normal, it was necessary to sell the birds as meat.

██ ██ It is now settled beyond all question that, in determining whether or not a requested peremptory instruction shall be given, the court must assume to be true all of the evidence for the party against whom such instruction is requested, together with all of the

reasonable inferences therefrom. This principle is so elemental as to need no citation of authority.

■■ When the foregoing principle is applied to the evidence and accompanying inferences in this case, it must be said that the plaintiff clearly made out a prima facie case of the defendant's negligence in setting off charges of dynamite, closer than usual to chicken houses, without previous warning, and with such noise and violence that it jarred a nearby house, upset a chair on the front porch of another nearby, and so frightened and panicked the chickens that they soon thereafter sustained a drop in egg production; and that Bridges on that account, not being able to bring them back to their former production, although he expended a substantial sum for that purpose, had to sell them for meat. Compare Yazoo and M. V. R. Co. v. Day, 120 Miss. 296, 82 So. 148.

The court evidently misinterpreted the evidence of the two experts because he seemed to think that the experts meant that the hens would quit laying when the truth of the matter was that their evidence was to the effect that there would be a drop in production. Besides, the daily record of eggs, which the plaintiff claimed that he gathered, referred to in the statement of facts, must have been completely overlooked.

■■ The appellee has raised other questions in an effort to obtain an affirmance of this cause; but those questions were not before the trial court when the directed verdict was given. Consequently this Court declines to give an advisory opinion on those matters.

It was error to give the peremptory instruction for the defendant when the plaintiff had made out a prima facie case. Consequently, the cause is therefore reversed and remanded for a new trial.

Reversed and remanded.

*Arrington, McElroy, Rodgers,* and *Jones, JJ.,* concur.